| | |
|---|---|
| ANGELA KAEPPLINGER AND BRIAN KAEPPLINGER, | |
| Plaintiffs, | No. 17 CV 5847 |
| v. | Magistrate Judge McShain |
| MICHAEL MICHELOTTI, M.D., ET AL. | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs Angela Kaepplinger and Brian Kaepplinger's motion to substitute experts. [221].[1] The motion is fully briefed, and the Court heard oral argument on June 9, 2021. [230]. For the reasons that follow, Plaintiffs' motion is granted.[2]

## Background

This is a medical malpractice case. On August 12, 2015, Angela Kaepplinger arrived at Rockford Memorial Hospital ("RMH") in Rockford, Illinois with abdominal pain. [130] 2, 6, ¶¶ 1, 34. A CT scan revealed a possible abscess in Angela Kaepplinger's colon. [*Id.*] 2, 6, ¶¶ 1, 35. She was admitted to and remained at RMH until August 29, 2015. [*Id.*] 6, 14, ¶¶ 35, 80. During that time, Ms. Kaepplinger underwent four surgical procedures, including a laparotomy and transverse

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The Court issued its ruling in a Minute Order on June 17, 2021 to provide the parties with as much notice as possible regarding its ruling in light of scheduling concerns. [233].

colectomy performed by Mark Zarnke, M.D. [*Id.*] 6, ¶ 38; [221] 2. Plaintiffs' Second Amended Complaint alleges that the procedure led to multiple complications during Angela's hospitalization at RMH, including a delayed diagnosis of an anastomic leak by Michael Michelotti, M.D, an infection, additional invasive procedures, and permanent injuries. [130] 2, 14, ¶¶ 1, 80; [221] 2.

On August 10, 2017, Plaintiffs filed suit against Dr. Zarnke, Dr. Michelotti, and their medical group, Surgical Associates of Northern Illinois, LLC ("Defendants"), alleging negligence in the care provided to Angela at RMH. [1]; [221] 2.[3] To support their allegations, Plaintiffs attached to their complaint a report authored by Alexander Nagle, M.D., a general surgeon at Northwestern Memorial Hospital, which opined that Defendants failed to meet the requisite standard of care in their treatment of Angela Kaepplinger. [1-1]; [221] 2.

Plaintiffs timely disclosed Dr. Nagle as an expert. On January 10, 2019, the magistrate judge presiding over the case, Judge Sidney I. Schenkier (Ret.),[4] entered a scheduling order requiring Plaintiffs to make their expert disclosures by March 15, 2019. [133]. Plaintiffs served their expert disclosures, which identified Dr. Nagle as Plaintiffs' surgical expert, on March 15, 2019. [221] 2; [221-2]. On July 18, 2019, Dr. Nagle sat for his deposition. [221] 3; [221-3]. Defendants' three expert surgeons sat

---

[3] The Complaint also named Michael McCarthy, D.O., RMH, and Rockford Health Physicians as defendants. McCarthy and Rockford Health Physicians were later dismissed without prejudice, pursuant to the parties' stipulation. [140, 181]. Plaintiffs also settled with Defendant RMH. [215]. Dr. Michelotti, Dr. Zarnke, and Surgical Associates of Northern Illinois, LLC remain defendants in the case.

[4] Pursuant to Local Rule 73.1(C), the parties consented to the reassignment of this case to a magistrate judge. [76].

for their depositions on July 29, 2019, July 31, 2019, and August 20, 2019. [226] 5–6. On August 20, 2019, Judge Schenkier set the case for a jury trial in February 2020. [182]. Plaintiffs' counsel emailed Dr. Nagle twice on September 3, 2019, and again on September 5, 2019, regarding Plaintiffs' desire to submit a rebuttal opinion to contradict the testimony of Defendants' experts. [221-4] 2–4. On September 6, 2019, Dr. Nagle responded that they would talk the following Monday, September 9, 2019. [*Id.*] 2.[5]

Several events transpired in the ensuing months: the February 2020 trial date was stricken due to scheduling conflicts [183, 185], Plaintiffs participated in a settlement conference (and ultimately settled) with Defendant RMH [186, 195, 215], Judge Schenkier retired [203], and a global pandemic erupted. The case was reassigned to the undersigned on April 29, 2020, [203], and, on July 21, 2020, this Court set a trial date of January 11, 2021. [210].

Days later, on August 5, 2020, Plaintiffs' counsel emailed Dr. Nagle to provide a case status update, including a tentative date for his testimony at trial. [221-6] 2. Dr. Nagle did not respond. Over the next few weeks, Plaintiffs' counsel made numerous attempts to reach Dr. Nagle over the phone and by email, including sending him eight emails between August 20, 2020 and October 19, 2020—with no response. [221] 4–5; [221-6] 3–10. Meanwhile, pursuant to administrative orders issued in response to the pandemic, the Court reset the trial date on November 3, 2020 (from January 11, 2021 to May 10, 2021), [219], and again on February 1, 2021

---

[5] At the June 9, 2021 motion hearing, Plaintiffs' counsel indicated that there may have been some additional contact with Dr. Nagle via telephone around this time.

(from May 10, 2021 to September 20, 2021). [220]. As of February 19, 2021, Plaintiffs' counsel had received no response from Dr. Nagle, despite calling him "dozens of times" at his business office and on his cell phone and leaving dozens of telephone messages, as well as sending six more emails between December 2020 and February 2021. [221-5] 3–4, ¶¶ 6A–6B; [221-6] 11–16.

Plaintiffs retained Joshua Braveman, M.D., a physician board certified in general surgery and colon and rectal surgery, on February 22, 2021. [221-5] 4, ¶ 7. Dr. Braveman issued a report on March 8, 2021, in which he opined that Defendants failed to comply with the standard of care in their treatment of Angela Kaepplinger. [*Id.*] 4, ¶ 8; [221-7]. Four days later, on March 12, 2021, Plaintiffs filed the instant motion to substitute experts, in which they seek to withdraw Dr. Nagle as an expert witness and disclose Dr. Braveman as an expert witness. [221].

Plaintiffs' motion has been fully briefed. The Court held a telephonic status hearing on May 18, 2021, during which the Court ordered Plaintiffs to subpoena Dr. Nagle to personally appear at a subsequent motion hearing on June 9, 2021 so that he could shed light on his non-responsiveness over the past several months. [228]. The Court also reset the trial date to September 22, 2021, with a final pretrial conference to occur on September 15, 2021 and motions *in limine* due by August 13, 2021. [*Id.*]. After being served with a subpoena, Dr. Nagle appeared at the June 9, 2021 hearing, along with his legal counsel, and was asked to explain his lack of responsiveness to Plaintiffs' counsel's efforts to reach him over the past several months. [230]. Dr. Nagle testified under oath that he no longer wishes to serve as

Plaintiffs' expert in this case. The parties presented oral arguments, which the Court has taken under consideration. The motion is granted for the following reasons.

## Legal Standard

The Federal Rules of Civil Procedure do not expressly dictate the standard a court should use to assess a motion to substitute an expert. District courts in this Circuit typically adopt one of two approaches when presented with such a motion. Some courts treat the motion as a request to amend the scheduling order under Rule 16(b)(4). *See, e.g., Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-CV-396, 2010 WL 3892860, at *2 (N.D. Ind. Sept. 30, 2010) (explaining that courts faced with a request to allow a substitute expert frequently rely on Rule 16(b) and treat such a request as a "de facto attempt to alter the scheduling order and enlarge the discovery period"). Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "When considering whether good cause exists, 'the primary consideration for districts courts is the diligence of the party seeking amendment.'" *J.F. by Sifuentes v. Abbott Laboratories, Inc.*, No. 14-CV-847, 2017 WL 992781, at *2 (S.D. Ill. Mar. 15, 2017) (quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011)).

Other courts look to Rules 26 and 37—they construe the motion as an untimely designation under Rule 26(a) and consider whether to exclude the substitute expert as a discovery violation under Rule 37(c). *See, e.g., Assaf v. Cottrell, Inc.*, No. 10 CV 0085, 2012 WL 245196, at *2 (N.D. Ill. Jan. 26, 2012) ("Rules 26 and 37 guide our inquiry to the extent that the requested substitution is a request to modify the

discovery schedule, and to the extent that [the moving party] violated the District Judge's discovery schedule by filing the motion at issue after the [applicable] discovery deadline."); *see also Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10-CV-204, 2013 WL 1403107, at *2 (N.D. Ill. Apr. 5, 2013) (noting that Rules 26 and 37 govern the dispute). Rule 26(a)(2)(D) provides that "[a] party must make [its expert] disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Under Rule 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1)). "In addition to, or instead of, that sanction a court may also require the payment of reasonable expenses, including attorney's fees, caused by the violation." *Assaf*, 2012 WL 245196, at *2; Fed. R. Civ. P. 37(c)(1)(A).

"When a party requests disclosure of an expert or expert report after the deadline for discovery, district courts in our Circuit have also provided guidance through a factor test." *Assaf*, 2012 WL 245196, at *2 & 2 n.33 (citing cases, including *Spray-Rite Servs. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir. 1982), *aff'd* 465 U.S. 752 (1984)). Courts consider: "(1) the surprise or prejudice to the blameless party; (2) any bad faith involved in not producing the evidence earlier; (3) the ability of the offending party to cure resulting prejudice; and (4) the amount of disruption to the trial that would result from permitting use of the evidence." *Id.* at *2. In addition, courts weigh "the effect that denial of the motion would have on the disposition of the

case." *Id.* at *3 (citing *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1095 (N.D. Ill. 2001)). "Where exclusion of an expert witness necessarily entails dismissal of the case, the sanction 'must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.'" *Id.* (quoting *Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000)).

Courts have broad discretion to resolve discovery disputes and impose sanctions. *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 888 (7th Cir. 2004).

## Discussion

As an initial matter, Plaintiffs and Defendants present their arguments within the multi-factor framework derived from *Spray-Rite*. The parties agree that the Court should consider: (1) the surprise or prejudice to the blameless party; (2) any bad faith involved in in not producing the evidence earlier; (3) the ability of the offending party to cure resulting prejudice; and (4) the amount of disruption to the trial that would result from permitting use of the evidence. [221] 6; [226] 10–11. Plaintiffs add that, in *Assaf*, the court also addressed "the effect that denial of the motion would have on the disposition of the case," which should be considered here. [221] 6 (citing 2012 WL 245196, at *2).

Defendants claim that Rules 26 and 37 should guide the Court's analysis. [226] 9–10. Plaintiffs do not expressly address whether the Court should look to Rules 26 and 37. Plaintiffs maintain, however, that they "are in full compliance with the Rule 26 scheduling Order" set in this case. [221] 6. In particular, Plaintiffs state that they

have not committed any discovery "violation" because they met the expert disclosure deadline set by Judge Schenkier and are merely "seeking leave of court, in good faith, to make a substitution of their expert because their timely disclosed expert has abandoned the case through no fault of their own." [227] 7. It is true that Plaintiffs met the expert disclosure deadline of March 15, 2019. [133]. Nonetheless, "Rules 26 and 37 guide our inquiry to the extent that the requested substitution is a request to modify the discovery schedule, and to the extent that [Plaintiffs] violated the [] discovery schedule by filing the motion at issue after the [] discovery deadline." *Assaf*, 2012 WL 245196, at *2.

Moreover, courts presented with motions to substitute an expert witness have found the Rule 16(b)(4) and Rule 37(c)(1) standards to be "coexistent." *J.F. by Sifuentes*, 2017 WL 992781, at *2.[6] This Court, like the court in *J.F. by Sifuentes*, finds that it need not determine whether any distinctions between the two rules "are ones of semantics or substance, because both the good cause and substantial justification standards are met by the facts before the Court." *Id.*

An additional point warrants brief discussion: much of the parties' argumentation in the briefing has been mooted in light of Dr. Nagle's sworn testimony at the June 9, 2021 motion hearing. In particular, the Court need not consider Plaintiffs' and Defendants' speculation as to the potential reasons for Dr.

---

[6] Some courts disagree. *See, e.g.*, *Carlson v. Fewins*, No. 1:08-CV-991, 2016 WL 7971764, at *1 (W.D. Mich. Oct. 19, 2016) ("The two rules impose different burdens on the moving party.").

Nagle's lack of responsiveness, nor any party's purported influence in dissuading him from serving as an expert in this case.

The Court now turns to the factors outlined above.

## A. Surprise or Prejudice

The Court first considers whether Defendants will be surprised or prejudiced by the substitution. Plaintiffs underscore that trial is not set to begin until late September 2021—over six months[7] from the filing of Plaintiffs' motion to substitute— and that they will make Dr. Braveman available for a deposition at a time that is convenient for the defense. [221] 7. Plaintiffs also state that they will neither (1) object to Defendants' experts modifying their opinions in response to Dr. Braveman's report and opinions; nor (2) seek supplemental depositions of Defendants' experts to address any such modifications. [*Id.*]; [227] 10–11.

Defendants maintain that they will be prejudiced by the substitution because Dr. Braveman is a superior expert, the substitution will impact the defense's trial strategies, and effectuating the substitution will carry significant costs. First, Defendants claim that Dr. Braveman is a superior expert because he is board certified in colon and rectal surgery, while Dr. Nagle is not a colon and rectal surgeon. [226] 11. Defendants argue that this is "an obvious point of cross-examination for the defense, especially since one of the defense experts, Dr. Joseph Kokoszka, is a colorectal surgeon and therefore may be seen by the jury as a more compelling, or

---

[7] March 12, 2021 to September 20, 2021—the trial date when Plaintiffs filed their motion—is not "over eight months," as Plaintiffs stated in their motion. [221] 7–8. The error (which Plaintiffs corrected on reply) is immaterial, however, as the Court agrees with Plaintiffs that there is sufficient time to effectuate the substitution prior to trial. [227] 12.

certainly more specialized witness than Dr. Nagle." [*Id.*]. Second, Defendants claim that Dr. Braveman is a superior expert in terms of the materials he has reviewed and that this will necessarily affect trial strategy. [*Id.*] 12–16. That is, Defendants argue that the belated disclosure of Dr. Braveman is "essentially an attempt to upend Judge Schenkier's original case scheduling order," pursuant to which Plaintiffs' expert disclosures and reports were due first. [*Id.*] 12. Defendants note that Dr. Braveman has had the benefit of reviewing Dr. Nagle's report and deposition, and particularly the cross examination of Dr. Nagle, as well as the reports and depositions of Defendants' experts. [*Id.*]. Thus, according to Defendants, Plaintiffs are now seeking to "clean up" admissions made by Dr. Nagle at his deposition that were harmful to Plaintiffs' case and supplement missing pieces of Dr. Nagle's report. [*Id.*] 12–15.

Defendants also claim that, if the substitution is allowed, they will suffer significant financial prejudice. [*Id.*] 16. In particular, Defendants state that they will have to take Dr. Braveman's deposition and, in turn, have their experts review that testimony and offer supplemental opinions, potentially resulting in "at least three more expert reports in addition to that of Dr. Braveman." [*Id.*]. This will, Defendants claim, "reset" expert discovery, as all defense experts "comment in their reports and depositions about Dr. Nagle" and "their testimony is in the context of disagreeing with Dr. Nagle." [*Id.*].

The Court acknowledges that substitution will necessarily result in some amount of prejudice to Defendants, especially where, as here, it occurs after all expert reports and depositions have been completed. This is unavoidable, however, in every

case where an expert can no longer testify in the latter stages of a case, no matter the reason for the substitution. This Court cannot at this point weigh substitution against the parties' original plan and cadre of experts—the original plan is no longer an option. The Court finds that there exists some measure of prejudice to Defendants, but it will address the ability of Plaintiffs to cure that prejudice in subsequent factors of this test.

## B. Bad Faith

The Court next addresses whether the delay between Plaintiffs' counsel becoming aware of Dr. Nagle's non-responsiveness and Plaintiffs bringing the instant motion to substitute indicates bad faith on the part of Plaintiffs. Part of that calculus is whether the delay was "substantially justified." *Assaf*, 2012 WL 245196, at *4. Plaintiffs point to their many efforts to reach Dr. Nagle, the onset of the pandemic and resulting postponements of the trial date, and the fact that, "[w]hen it became clear that Dr. Nagle was not going to cooperate, and then only after giving him plenty of time to respond because of the pandemic, Plaintiffs sought and obtained an alternative expert, Dr. Braveman, and filed this motion, well in advance of the scheduled trial." [221] 7; [227] 11.

Defendants argue that Plaintiffs have "shown a lack of diligence" in failing to raise the issue of Dr. Nagle's non-responsiveness earlier. [226] 18–19. They point to the fact that Plaintiffs' counsel had failed to make contact with Dr. Nagle since September 2019 yet waited approximately 18 months from that time to file the instant motion. [*Id.*] 17–19. Defendants claim that Plaintiffs are "using the COVID-

19 delay as a predicate to obtain a superior expert witness from their initial choice."
[*Id.*] 19.

The 18-month gap is a distortion of the facts and an over-simplification of the relationship between attorneys and expert witnesses. Subsequent events followed on the heels of Plaintiffs' counsel's lack of contact with Dr. Nagle beginning in September 2019 and obviated the need for immediate confirmation from the expert as to his availability. The Court struck the trial date the next month, and settlement efforts almost exclusively carried the litigation for several months thereafter, ending with a settlement conference between Plaintiffs and RMH in March 2020. Less than two weeks after that, orders from the Northern District of Illinois began to extend civil cases as the pandemic hit. *See, e.g.*, [197–98, 202].

The Court recognizes that prudence might have dictated flagging Dr. Nagle's non-responsiveness with defense counsel, and potentially the Court, at an earlier stage. The Court's review of the email communications from Plaintiffs' counsel to Dr. Nagel reflect that, by mid-October 2020, Dr. Nagle's non-responsiveness had driven Plaintiffs' counsel to the point of emailing him, "Please respond. Otherwise, I will have to come visit you either at work or at your home." [221-6] 9. At that point, as Defendants note, the trial date was set for January 11, 2021, with motions *in limine* due December 7, 2020. [226] 19; [210]. However, less than three weeks later, on November 3, 2020, the trial date was moved yet again—and then moved again three months after that.

One might ascribe tardiness to Plaintiffs' counsel with the benefit of hindsight, but it can be a delicate balance weighing the appropriate time to file a motion or reach out to opposing counsel about a *potential* issue—especially with months remaining to try and rectify the issue without costing the other parties and the Court time and expense. Indeed, at the motion hearing, defense counsel raised the fact that experts are notoriously difficult to marshal given that they are busy by nature. The Court thus declines to retrofit a deadline by which Plaintiffs' counsel should have flagged the issue, particularly given the fluidity of the trial schedule due to the pandemic.[8] Plaintiffs' counsel made multiple attempts to reach Dr. Nagle to no avail, and the Court disagrees with Defendants that Plaintiffs have not demonstrated "any meaningful diligence" in their substitution efforts. [226] 19. The Court also finds reasonable Plaintiffs' counsel's explanation at the motion hearing that he believed securing a substitute expert as quickly as possible was the most efficient way forward. The Court finds no bad faith on the part of Plaintiffs.

## C. Plaintiffs' Ability to Cure Prejudice if Substitution is Permitted

In their motion, Plaintiffs proposed that any potential prejudice to Defendants can be remedied by allowing Defendants to take Dr. Braveman's deposition and supplement their surgical experts' disclosures. [221] 7. On reply, Plaintiffs further proposed that they will not seek to depose Defendants' experts regarding these

---

[8] At the motion hearing, Plaintiffs' lead counsel, Mr. Axelrod, revealed that he was suffering from kidney failure in summer 2020 and ultimately underwent a kidney transplant surgery in September 2020. Counsel explained that, up until that point, the pandemic had been in full swing, and the parties did not know when the trial would proceed. Once the trial was set for January 2021, Mr. Axelrod reached back out to Dr. Nagle and continued to try to get a hold of him, while Mr. Axelrod also struggled with his own health.

modifications to their disclosures. [227] 11. At the motion hearing, Plaintiffs' counsel went a step further, acknowledging that certain limitations on the scope of Dr. Braveman's testimony may be warranted and representing that Plaintiffs would be willing to stipulate to those limitations.

Defendants argue that, to avoid the prejudice caused by Plaintiffs' disclosure of Dr. Braveman, Plaintiffs should have first sought leave of court to substitute Dr. Nagle before securing and disclosing a substitute expert. [226] 17. Defendants claim that they "could have then moved for a protective order and requested that the Court could limit the materials that the substitute expert could review" to provide for a more close "substitute," and the Court could have mandated that Plaintiffs obtain an expert with the same qualifications and board certifications as Dr. Nagle, as well as the "exact opinions" of Dr. Nagle. [*Id.*]. Instead, Defendants claim that Plaintiffs have "essentially deprived the Defendants of any right to object to the new disclosure other than *in toto* and they have deprived the court of any opportunity to fashion a remedy [and t]here is simply no way to cure the prejudice caused by Plaintiffs' attempt to substitute Dr. Braveman as a superior expert to Dr. Nagle short of denying Plaintiffs' motion in full." [*Id.*] 17–18.

The Court disagrees. To minimize prejudice to the opposing party, "courts generally limit the scope of the testimony that may be given by the substitute expert." *Lincoln Nat'l*, 2010 WL 3892860, at *2; *see also Medpace, Inc. v. Biothera, Inc.*, No. 1:12-cv-179, 2014 WL 1045960, at *4 (S.D. Ohio Mar. 17, 2014) ("Courts granting motions to substitute experts after the close of discovery have routinely required the

new expert's testimony to be limited to the subject matter opinions espoused in the first expert's report."). "[T]he introduction of a substitute expert does not *ipso facto* permit [the party requesting the substitution] to escape from the concessions or admissions of [the original expert]." *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D.P.R. 2009); *see also J.F. by Sifuentes*, 2017 WL 992781, at *3 (holding that the unavailability of the prior expert did not grant the moving party "*carte blanche* to generate new theories after several years of litigation" and requiring that the substitute expert "have a similar area of expertise" and provide a report and testimony "that adheres to the subjects and theories covered by [the prior expert]"). The substitute expert's report and testimony are thus "frequently limited to the subject matter and theories already espoused by the former expert." *Lincoln Nat'l*, 2010 WL 3892860, at *2; *see also U.S. ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 2:13-cv-01907, 2015 WL 1546717, at *2 (D. Nev. Apr. 6, 2015) (holding that while the substitute expert need not "rubber-stamp" the prior expert's report or put forth "identical" opinions, the new expert report "may not provide an opinion that is contrary to or inconsistent with [the original expert]'s opinion" and "it is reasonable to limit the new expert to findings that are substantially similar to those presented by [the original expert]"); *Shipp v. Arnold*, No. 4:18-cv-4017, 2019 WL 4040597, at *3 (W.D. Ark. Aug. 27, 2019) ("Assuming that there is no meaningful change in the subject matter and theories expressed by [the moving party]'s new expert, the Court finds that [the opposing parties] will suffer little prejudice with respect to the development of their litigation and dispositive motion strategies, as the new expert

must hold substantially the same opinions as [the original expert].”); *Medpace*, 2014 WL 1045960, at *4 (“While Medpace obviously cannot guarantee that its new expert will adopt all of [the prior expert]’s opinions, or articulate opinions in the same manner, if Medpace insists on proceeding with a new expert, it is reasonable to limit that expert to findings that are ‘substantially similar’ to those presented in [the prior expert]’s comprehensive reports.”).

Although courts generally restrict the substitute expert’s testimony to the same subject matter as the original expert, “the substitute is not normally required to simply adopt the prior expert’s conclusions verbatim—in effect, doing little more than authenticating and confirming the prior expert’s conclusions.” *Lincoln Nat’l*, 2010 WL 3892860, at *3. The substitute expert “should be able to proceed with his testimony as any other expert would with the caveat that he address the same subject matter as [the prior expert] without meaningful changes.” *Morel*, 259 F.R.D. at 22.

Defendants point to areas in Dr. Braveman’s report where, they claim, he diverges from his predecessor. Defendants claim some of Dr. Braveman’s opinions are “entirely new,” such as his opinions regarding Dr. Zarnke’s deviation from the standard of care (at page 12, ¶ 6 of Dr. Braveman’s report). [226] 13. Defendants claim others are missing. For example, Defendants state that Dr. Nagle’s report includes “opinions critical of former Defendant Rockford Memorial Hospital and its employee, Nurse Petty,” while Dr. Braveman’s report is silent regarding any alleged negligence of Nurse Petty. [*Id.*] 15. And some, Defendants claim, are a deliberate attempt to “fix” concessions made by Dr. Nagle. [*Id.*] 13–15.

At the motion hearing, however, Plaintiffs' counsel represented that Plaintiffs are willing to stipulate to various limitations on the scope of Dr. Braveman's testimony. Indeed, Plaintiffs' counsel even indicated a willingness to add opinions to the report. Contrary to defense counsel's statements at the motion hearing that Defendants will necessarily be prejudiced by the absence of criticism of Nurse Petty in Dr. Braveman's report, Plaintiffs' counsel stated that the only reason that that point was not included in the report was because Plaintiffs had settled with RMH, that he was sure Dr. Braveman would have the same exact opinion regarding Nurse Petty's negligence, and that he would be happy to stipulate accordingly. Plaintiffs' counsel also represented that Plaintiffs would be willing to forego introducing Dr. Braveman as a board-certified colorectal surgeon at trial. Yet, Defendants claim that even if the Court were to limit Dr. Braveman's opinions to the "exact opinions disclosed by Dr. Nagle," they will remain prejudiced because "Dr. Braveman cannot unlearn that which he has learned by reviewing Dr. Nagle's deposition, or by reading the defense expert depositions." [*Id.*] 16.

The Court disagrees that appropriate limitations on the scope of Dr. Braveman's report and testimony cannot cure any prejudice identified by Defendants. Further, the Court's ruling that substitution of Dr. Nagle is appropriate based on his unwillingness to proceed as an expert in this case should not be taken as a second bite at the apple. *Lincoln Nat'l*, 2010 WL 3892860, at *2 (citing *Adams v. Cooper Indus., Inc.*, No. 03-476, 2007 WL 1075652, at *3 (E.D. Ky. Apr. 5, 2007) ('This substitution was intended to put the plaintiffs in as good a position as they would

have held had [the prior expert] performed his job as expected; it was not intended to allow the plaintiffs to designate a superior . . . expert after the deadline for expert disclosures.").

Dr. Braveman's testimony should be limited to the same subject matter as Dr. Nagle without any meaningful changes. This does not require that Dr. Braveman parrot every opinion put forth by Dr. Nagle at his deposition—the Court will not compel an expert to state an opinion with which he does not agree. The parties are directed to meet and confer regarding the scheduling of Dr. Braveman's deposition (if they have not done so already). In doing so, the parties are encouraged to work together to determine the appropriate scope of testimony, bearing in mind the above principles. If any disputes remain after the parties have completed Dr. Braveman's deposition and conferred regarding any disagreements as to the appropriate scope, Defendants may move for the exclusion of any information they feel strays materially beyond the scope of Dr. Nagle's report or testimony. *Lincoln Nat'l*, 2010 WL 3892860, at *4; *Morel*, 259 F.R.D. at 23; *TIC – The Indus. Co. Wyo. v. Factory Mut. Ins. Co.*, No. 4:10-cv-3153, 2012 WL 2830867, at *9 (D. Neb. July 10, 2012) (citing *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614, 616 (D. Colo. 2012); *Shipp*, 2019 WL 4040597, at *3.

Defendants also raise the issue of financial prejudice. They argue that, if substitution is permitted, "Plaintiffs should be made to pay defense attorney fees and expenses involved in deposing Dr. Braveman and supplementing defense expert

reports and any additional discovery related to the substitution of Dr. Braveman."
[226] 16–17.

"Generally, in cases in which courts have awarded costs and expenses associated with the substitution of an expert, there has been some evidence of bad faith, fault, or tactical maneuvering on the part of the party making the substitution." *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 3:06-cv-1710, 2009 WL 5184404, at *4 (D. Conn. Dec. 23, 2009) (collecting cases); *TIC – The Indus. Co. Wyo.*, 2012 WL 2830867, at *10 (declining to award costs and expenses). In lieu of awarding costs and expenses associated with the substitution, courts frequently limit the scope of the substitute expert's testimony. *See, e.g.*, *Medpace*, 2014 WL 1045960, at *5 (declining to award costs and expenses associated with substitution but, "to mitigate additional costs," court limited the new expert to "substantially similar" opinions); *Doctor's Assocs.*, 2009 WL 5184404, at *5 (substantially limiting the scope of expert testimony to offset the "significantly worse position" the substitution placed on the opposing party).

The Court finds that fees are unwarranted under the circumstances. There is no evidence of bad faith on Plaintiffs' part in the record before the Court. While Defendants have argued that Plaintiffs are "using the COVID-19 delay as a predicate to obtain a superior expert witness" and using Dr. Braveman to "fix" purported concessions made by Dr. Nagle, there is no support for these claims in the record. The Court recognizes that Defendants will incur additional costs in deposing Dr. Braveman and (potentially) supplementing their expert reports. But these additional

costs were all but assured even if Plaintiffs had moved earlier. Plaintiffs' substitute expert and the ancillary costs associated therewith—supplemental reports, depositions, or motions *in limine*—were baked into the cake, given Dr. Nagle's unwillingness to proceed. The Court's directive that Dr. Braveman's testimony must not be meaningfully changed from Dr. Nagle's will offset any prejudice.

## D. Effect of Substitution on Trial Date

Plaintiffs maintain that there is plenty of time to conduct any additional discovery stemming from the substitution, including Defendants' taking Dr. Braveman's deposition and permitting Defendants' surgical experts to supplement their opinions as necessary. [221] 8; [227] 12.

Defendants argue that, if Plaintiffs' motion is granted, it will take some time to depose Dr. Braveman, obtain the deposition transcript, share the transcript with Defendants' experts, and obtain supplemental disclosures. [226] 18. According to Defendants, it is "highly unlikely" that this supplemental discovery can be completed in time for pretrial activity, and it is "almost certain" that the parties and the Court will not be ready for trial if the substitution is allowed. [*Id.*].

While the Court recognizes that adding a deposition and (likely) supplemental disclosures in response tightens the timeline, the Court does not share Defendants' outlook that these requirements imperil the September trial date. The Court is mindful of the multiple continuances of the trial date thus far but plans to proceed with the trial on September 22, 2021. The Court is not intractable, however, should a continuance be essential to avoid prejudice. *Shipp*, 2019 WL 4040597, at *3 (citing

*TIC – The Indus. Co. Wyo.*, 2012 WL 2830867, at *8 (allowing substitution of an expert and noting, "the trial of this case is still two months away and, upon the parties' motion, could be continued again to permit a full and fair trial of all the issues"). The Court finds that this factor presents no reason to deny substitution.

### E. Effect of Denying Substitution on the Disposition of the Case

Denying the requested relief yields one of two results: the absence of a surgical expert in a medical malpractice surgery case or testimony by an expert hostile to the party on whose behalf he is testifying. Either could doom Plaintiffs' case. "Courts closely examine their decision-making when denial of some requested relief will dispose of the case." *Assaf*, 2012 WL 245196, at *6. "Disposing of a case, as a sanction, should be employed only in extreme situations, where there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailable." *Id.* (internal quotations and citations omitted). "Dismissal of a case for late disclosure of an expert report is improper where the late disclosure of an expert report was harmless and it contained the plaintiff's 'primary—if not sole—evidence' on a dispositive issue." *Id.* (quoting *Spearman Indus.*, 138 F. Supp. 2d. at 1095).

Plaintiffs claim that they will be "severely prejudiced" if the Court does not allow them to substitute Dr. Braveman for Dr. Nagle. [227] 1. Without Dr. Braveman, Plaintiffs state that they will be "left without a surgical expert in a case that revolves around the care provided by surgeons." [*Id.*] 13. Put differently, Plaintiffs "will have no standard of care expert and will be unable to meet their burden of proof, resulting in a directed verdict." [*Id.*] 4.

In response, Defendants proposed that Plaintiffs can subpoena Dr. Nagle to appear at trial. [226] 20. At the motion hearing, defense counsel suggested that Dr. Nagle is not truly unavailable to testify at trial. Rather, his responses as to why he cannot continue were merely that it would be difficult scheduling wise and stressful for him. Defense counsel further suggested that Defendants' experts are equally busy, and this is not a sufficient reason to allow substitution. Indeed, defense counsel implied that, because Dr. Nagle was able to appear at the hearing, the Court should infer that he will also carve out time to prepare for and appear at trial, particularly if compelled to do so by the Court. Alternatively, Defendants proposed in their opposition that Dr. Nagle's deposition transcript can be read at trial. [*Id.*] 9.

The Court is unpersuaded that either of Defendants' proposals offers an appropriate solution. As defense counsel noted at the motion hearing, the parties did not point the Court to any cases in which an expert has been substituted based on the expert's sheer unwillingness to continue.[9] Nonetheless, courts have recognized that substitution is appropriate where the expert is uncooperative. *See, e.g.*, *Gulf Coast Shippers Ltd. P'ship v. DHL Express (USA), Inc.*, No. 2:09-cv-221, 2013 WL 5739781, at *2 (D. Utah Oct. 22, 2013) (allowing party to substitute expert where "[s]imply put, [the expert] does not want to participate in the case, and the decision is out of [the party]'s control"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2017 WL 2363010, at *1 (N.D. Ohio May 31, 2017) ("Dr.

_____

[9] Given that the reason for Dr. Nagle's non-responsiveness was only revealed at the June 9, 2021 motion hearing—after Plaintiffs' motion was fully briefed—the briefing identifies no cases in which experts have (or have not) been replaced based on an unwillingness to proceed.

Hallman is unable—and no longer willing—to provide expert assistance to Lead Plaintiff in the case at bar. Forcing Lead Plaintiff's counsel to work with an unwilling expert would be prejudicial to Lead Plaintiff and the class it seeks to represent."); *Stephenson v. Wyeth LLC*, No. 04-2312, 2011 WL 4553051, at *1–3 (D. Kan. Sept. 29, 2011) (granting motion to substitute expert where expert "elected to terminate his relationship with plaintiff," in part because "[it] d[id] not appear that plaintiff's counsel was involved in [the expert]'s decision—and it would be improper to punish plaintiff for a change in circumstances beyond her control"); *Avant Garde Eng'g & Res. Ltd. v. Nationwide Equip. Co.*, No. 3:11-cv-525, 2013 WL 12153534, at *2 (M.D. Fla. Sept. 11, 2013) (granting plaintiff's appeal of magistrate judge's order denying motion to replace expert where the expert "completely refuse[d] to communicate with Plaintiff").

In this case, there is no doubt that Dr. Nagle is unwilling to proceed. To begin, he ignored Plaintiffs' counsel's numerous attempts to reach him—and ultimately, only broke his silence when confronted with a subpoena. When asked why he had not responded to Plaintiffs' counsel, Dr. Nagle gave an array of responses, including: "I'm no longer interested or want to do this type of work"; "I just no longer do this type of work"; "my schedule is too busy"; "I'm just very busy at work [and] under a lot of stress"; "It's just been a very stressful year with the pandemic and also personal issues"; and "different priorities." Moreover, when asked by his counsel whether he has any plans to ever serve as an expert witness in the future, Dr. Nagle said that he does not. Whether the underlying reason for Dr. Nagle's lack of desire to proceed can

be attributed to retirement, undisclosed personal obligations, or something else, the upshot is that he does not want to proceed. Indeed, after the Court explained to Dr. Nagle how rare this situation was and the prejudice he was causing to both Plaintiffs and Defendants in this long-pending civil case, the Court asked Dr. Nagle if he was willing to change his mind and follow through on his commitment to serve as Plaintiffs' expert in the case. Dr. Nagle responded that he was not. When asked why, he ultimately answered, "I just really don't want to do it." As if to put an exclamation point on his lack of desire to fulfill his previous role as Plaintiffs' expert, Plaintiffs' counsel informed the Court during oral argument (after Dr. Nagle had testified) that Dr. Nagle's counsel saw fit to contact Plaintiffs' counsel's office and inform them that Dr. Nagle would be a hostile witness and Plaintiffs would not be able to use him anymore. Defense counsel hypothesized that Dr. Nagle was probably nervous, that his body language would be different at trial, and that, if obligated, he would make the time to get the job done. Regardless of his stated reasons, it is clear to this Court based on his testimony, his body language, and his attorney's follow-up text to Plaintiffs' counsel that Dr. Nagle no longer wishes to serve as Plaintiffs' expert in this case. Defense counsel's suggestions at the hearing that Dr. Nagle is "someone who has expressed some reluctance" ignores this reality.

Even assuming that Dr. Nagle would appear at trial, if subpoenaed to do so, the Court finds that this would be unavoidably prejudicial to Plaintiffs. The Court will not require Plaintiffs to hope for the best, particularly when Dr. Nagle's attorney has represented that he will be a hostile witness. Beyond the trial, the Court is not

convinced that Dr. Nagle would cooperate in terms of preparation. At the motion hearing, defense counsel stated that the hard work (*i.e.*, the expert report and deposition) has already been done, and all that remains is for Dr. Nagle to take the stand, take an oath, and tell the truth (albeit with some preparation). This understates an expert's role—both at trial and in the days leading up to it—including, at a minimum, the need for an expert to be cooperative with and willing to take direction from the attorneys tasked with preparing the expert and putting the expert on the stand, as well as appear congenial and engaged during his testimony before the jury. Defense counsel's suggestion at the motion hearing that the parties may not necessarily be guaranteed a "fantastic relationship with their expert" understates the current dispute by an order of magnitude. This is not a situation where the attorney-expert relationship is "good, not great," but rather one in which the expert has signaled he will likely be a net negative for the parties that retained him to assist with their case.

The Court acknowledges that Plaintiffs' counsel could have raised Dr. Nagle's non-responsiveness at an earlier stage. Even if such a delay was error, however, it does not merit such a severe punishment—forcing Plaintiffs to prosecute their case using a hostile expert witness as their sole witness on standard of care. Additionally, the Court agrees with Plaintiffs that deposition testimony would be an insufficient remedy for the reasons that Plaintiffs raised on reply. [227] 12–13. Among them, Plaintiffs argue that "[b]esides taking away the jury's ability to gauge the credibility of the witness by personally observing how he handles questions in real time, it is

especially prejudicial to Plaintiffs in this instance since the deposition was taken for discovery purposes and Defense counsel took the lead in the deposition and asked questions first, leaving Plaintiff with no control over the sequence of the questions." [227] 5–6, 12–13.

The Court finds that the substitution is warranted under the Federal Rules, whether viewed through the lens of Rule 16's "good cause" or Rule 37's "substantially justified" standards. Dr. Nagle's unwillingness to continue is not within Plaintiffs' control, and Plaintiffs' counsel made reasonably diligent efforts to reach Dr. Nagle and raise the issue considering the attendant factors over the past several months.

### Conclusion

Plaintiffs' motion to substitute experts [221] is granted subject to the above.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: June 25, 2021**