# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANGELA KAEPPLINGER AND
BRIAN KAEPPLINGER,

     Plaintiffs,

     v.

MICHAEL MICHELOTTI, M.D., ET AL.

     Defendants.

No. 17 CV 5847

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Pending before the Court are multiple motions *in limine*: Plaintiffs Angela Kaepplinger and Brian Kaepplinger's ("Plaintiffs") Motion *in Limine* No. 20 [273],[1] which seeks to preclude Defendants Dr. Mark Zarnke and Surgical Associates of Northern Illinois, LLC ("SANI") from calling Dr. Malcolm Bilimoria as an expert witness at trial;[2] Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 16 [268] regarding barring certain opinions of Plaintiffs' expert Dr. Joshua Braveman; Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 23 [270], which seeks to bar Plaintiffs' expert David Gibson; and Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24. [274], which seeks to bar or limit the testimony of Plaintiffs' expert Dr. Bradley Sewick.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The Court granted Plaintiffs' Motion *in Limine* No. 20 at the Final Pretrial Conference on December 16, 2021, [309], but includes the motion in this written order to further explain the reasoning behind the Court's decision.

The Court has considered the parties' briefing,[3] and the arguments made during the Final Pretrial Conference held on December 16 and December 20, 2021.[4] The Court rules on the pending motions as follows: Plaintiffs' Motion *in Limine* No. 20 is granted; Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 16 is granted; Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 23 is denied; and, Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24 is granted in part and denied in part.

## Background

This is a medical malpractice case. On August 12, 2015, Angela Kaepplinger arrived at Rockford Memorial Hospital ("RMH") in Rockford, Illinois with abdominal pain. [130] 2, 6, ¶¶ 1, 34. A CT scan revealed a possible abscess in her colon. [*Id.*] 2, 6, ¶¶ 1, 35. She was admitted to and remained at RMH until August 29, 2015. [*Id.*] 6, 14, ¶¶ 35, 80. After her admission, Defendant Mark Zarnke, M.D., was consulted and examined Ms. Kaepplinger, and noted his impression that she had transverse diverticulitis with an abscess. [*Id.*] 6 ¶37. Dr. Zarnke discussed treatment options with Ms. Kaepplinger, including antibiotic therapy and surgery, and ultimately recommended surgery. [*Id.*]. During her hospital stay Ms. Kaepplinger eventually underwent four surgical procedures, including a laparotomy and transverse colectomy performed by Dr. Zarnke. [*Id.*] 6, ¶ 38; [221] 2. Plaintiffs' Second Amended Complaint alleges that the procedure led to multiple complications during Ms.

---

[3] *See* docket entries [268, 270, 273, 274, 279, 283, 292, 293, 301, 302].

[4] The Court has utilized uncertified transcripts of the Final Pretrial Conference to complete this Memorandum Opinion and Order.

Kaepplinger's hospitalization at RMH, including a delayed diagnosis of an anastomic leak by Michael Michelotti, M.D., an infection, additional invasive procedures, and permanent injuries. [130] 2, 14, ¶¶ 1, 80; [221] 2.

On August 10, 2017, Plaintiffs filed suit against Dr. Zarnke, Dr. Michelotti, and their medical group, SANI, alleging medical negligence in the care provided to Ms. Kaepplinger at RMH, and loss of consortium on behalf of Mr. Kaepplinger. [1]; [221] 2.[5] The case is currently set to proceed to trial starting on September 12, 2022.[6]

Presently before the Court are several motions *in limine* related to the parties' respective Federal Rule of Civil Procedure 26(a)(2)(B) expert witnesses whom they intend to call at trial. Plaintiffs have disclosed Joshua Braveman, M.D., as their surgical expert to testify to the ways in which Dr. Zarnke and Dr. Michelotti failed to meet the requisite standard of care in their treatment of Ms. Kaepplinger.[7] Plaintiffs have additionally disclosed vocational economist David Gibson to testify as to Ms. Kaepplinger's loss of lifetime earning capacity as a result of the injuries she claims to have suffered due to Defendants' alleged medical malpractice, [270-1, 292], and neuropsychologist Bradley Sewick, Ph.D., to testify as to Ms. Kaepplinger's alleged

---

[5] The Complaint also named Michael McCarthy, D.O., RMH, and Rockford Health Physicians as defendants. McCarthy and Rockford Health Physicians were later dismissed without prejudice, pursuant to the parties' stipulation. [140, 181]. Plaintiffs also settled with Defendant RMH. [215]. Dr. Michelotti, Dr. Zarnke, and SANI remain defendants in the case.

[6] At the time the parties submitted their motions *in limine,* the trial date was set for January 21, 2022, but the date was reset due to the ongoing COVID-19 pandemic. [312, 316].

[7] Plaintiffs originally disclosed another expert, Dr. Alexander Nagle, to testify to the standard of care, but subsequently moved to withdraw Dr. Nagle and substitute Dr. Braveman. The substitution of Dr. Braveman and the scope of his opinions have already been the subject of extensive motion practice before the Court. *See, e.g.,* [236, 259, 297].

permanent psychological and cognitive impairments which Plaintiffs' claim resulted from her extended hospital stay. [293].

Defendants Dr. Zarnke and SANI have designated two surgical standard of care expert witnesses to testify at trial on their behalf: Joseph Kokoszka, M.D., and Malcolm Bilimoria, M.D. Defendants Dr. Zarnke and SANI first disclosed Dr. Kokoszka in their Rule 26(a)(2) disclosure submitted on May 31, 2019, which was the deadline set by the Court. [133][8]. The disclosure indicated that Dr. Kokoszka would testify as to the ways in which Dr. Zarnke met the applicable standard of care of a reasonably careful general surgeon, and attached his written report. [273-1] 2, 9. On the same day, former-Defendant RMH disclosed Dr. Bilimoria as one of their Rule 26(a)(2)(B) witnesses. [273-2] 2. RMH's disclosure indicated that Dr. Bilimoria would testify consistent with his written report, in which he offered opinions that both Dr. Zarnke and Dr. Michelotti acted appropriately within the standard of care. [*Id.*] at 2, 18. Defendant Dr. Michelotti, who is represented by separate counsel than Dr. Zarnke and SANI, disclosed Anthony Altimari, M.D., as his Rule 26(a)(2)(B) witness. [174-1] 1. The disclosure indicated Dr. Altimari would testify to his opinion that Dr. Michelotti met the standard of care of a reasonably careful general surgeon. [*Id.*]

On October 13, 2020, after RMH was dismissed from the case pursuant to settlement, counsel for Defendants Dr. Zarnke and SANI notified Plaintiffs' counsel of their intent to call Dr. Bilimoria as "another expert witness at trial." [273-3].

---

[8] The scheduling order was entered on January 10, 2019, by Judge Sidney I. Schenkier (Ret.), whom was the magistrate judge presiding over the case at the time. Pursuant to Local Rule 73.1(C), the parties consented to the reassignment of this case to a magistrate judge to conduct all proceedings. [76].

Defense counsel pointed to language in a footnote in their May 31, 2019, disclosure which stated that Defendants Dr. Zarnke and SANI "expressly incorporate herein and disclose all of the individuals disclosed by the Plaintiff and Co-Defendants in this action and all individuals who sat for depositions in this action." [273] 3. Plaintiffs' counsel objected to the addition of Dr. Bilimoria, and asked whether Defendants Dr. Zarnke and SANI intended to call both Dr. Kokoszka and Dr. Bilimoria at trial, to which defense counsel responded that they did. [*Id.*]

On November 12, 2021, in accordance with the scheduling order entered by the Court, the parties submitted their pre-trial motions *in limine*.[9] Plaintiffs' Motion *in Limine* No. 20 seeks to preclude Defendants Dr. Zarnke and SANI from calling Dr. Bilimoria at trial. [273]. Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 16 seeks to limit Dr. Braveman's testimony by preventing him from testifying with respect to his specific opinion that Dr. Zarnke breached the standard of care by failing to have a colonoscopy performed. [268]. Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 23 seeks to bar Plaintiffs' expert David Gibson. [270]. Finally, Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24. seeks to bar or limit the testimony of Dr. Sewick. [274].[10]

---

[9] The parties collectively submitted 57 motions *in limine*. The Court has already ruled on the record with respect to all of the motions except for Defendants Dr. Zarnke and SANI's Motions *in Limine* Nos. 16, 23, and 24. [309]. As noted above, the Court has included Plaintiffs' Motion No. 20 in this order to further explain the reasoning behind its ruling.

[10] Defendant Dr. Michelotti filed a motion to join in Defendants Dr. Zarnke and SANI's opposition to Plaintiffs' motions *in limine*. [294]. With respect to Dr. Zarnke's and SANI's affirmative motions *in limine*, counsel for Dr. Michelotti confirmed during the Final Pretrial Conference that Dr. Michelotti joined in his co-defendants' motions. Given that, for the sake of efficiency the Court will use "Defendants" herein to refer to all three defendants and will otherwise specify between the individual defendants as necessary.

## Legal Standards

### A. Motions *in Limine*

Trial courts have broad discretion in ruling on evidentiary issues before and during trial. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016); *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 447 (7th Cir. 2014). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984); *see also Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016) ("The Federal Rules of Civil Procedure set out many of the specific powers of a federal district court," but "they are not all encompassing," for example, they make no provision "for the power of a judge to hear a motion *in limine*."). "Trial courts issue rulings on motions *in limine* to guide the parties on what evidence it will admit later in trial," and "[a]s a trial progresses, the presiding judge remains free to alter earlier rulings." *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013).

It is well-established that a motion *in limine* "is an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings" and that it "permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997).

## B. Federal Rules of Evidence and the *Daubert* Standard

In addition to the general considerations for motions *in limine*, several evidentiary rules guide the Court's analysis regarding the admissibility of evidence, including expert testimony. Pursuant to Federal Rule of Evidence 401,[11] evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401; *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). Rule 402 "provides the corollary that, with certain exceptions, '[r]elevant evidence is admissible' and '[i]rrelevant evidence is not admissible.'" *Boros*, 668 F.3d at 907. However, under Federal Rule of Evidence 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Rule 403 "applies to expert testimony just as it applies to any other evidence. *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coordination Pretrial Proc.*, No. 14 C 1748, 2018 WL 1316724, at *2 (N.D. Ill. Mar. 14, 2018). In keeping with this rule, "this district generally prohibits a party from offering multiple experts

---

[11] As this Court's jurisdiction is based on diversity of citizenship, the Court applies federal procedural law and Illinois state substantive law. *Allen v. Cedar Real Est. Grp., LLP*, 236 F.3d 374, 380 (7th Cir. 2001) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, (1938)). Therefore, "the Federal Rules of Evidence apply to determine whether particular evidence is admissible." *Hammond v. Sys. Transp., Inc.*, 942 F. Supp. 2d 867, 872 (C.D. Ill. 2013) (citing *In re Air Crash Disaster Near Chi., Ill. on May 25, 1979*, 701 F.2d 1189, 1193 (7th Cir. 1983)). However, the Court notes that the question of whether any particular piece of evidence is relevant may sometimes be "ascertainable only by reference to the substantive law of the state." *See In re Air Crash Disaster*, 701 F.2d at 1193. The Court will refer to the relevant Illinois substantive law for medical negligence cases where appropriate.

7

to express the same opinions on a subject." *Sunstar, Inc. v. Alberto-Culver Co.*, No. 01 C 736, 2004 WL 1899927, at *25 (N.D. Ill. Aug. 23, 2004). "Multiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative. It also raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Id.*

The admissibility of expert testimony is also specifically governed by Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Supreme Court recognized the important "gatekeeping" role of the trial court, and held that Rule 702 requires the court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589 n. 7.

In the Seventh Circuit, courts engage in a three-step inquiry in order to determine whether expert evidence is relevant and reliable: "(1) whether the witness

is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Rossi v. Groft*, No. 10 C 50240, 2013 WL 1632065, at *2 (N.D. Ill. Apr. 16, 2013) (citing *Myers v. Ill. C. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). The proponent of the expert witness bears the burden of establishing that the expert satisfies the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (internal citations omitted).[12]

## Discussion

### A. Plaintiffs' Motion *in Limine* No. 20

Plaintiffs seek to preclude Defendants Dr. Zarnke and SANI from calling Dr. Bilimoria as an expert witness at trial. Plaintiffs argue that Dr. Bilimoria should be excluded because: (1) any testimony from Dr. Bilimoria would be cumulative of the testimony of other defense expert witnesses, Dr. Kokoszka and Dr. Altimari; and (2)

---

[12] None of the parties requested an evidentiary hearing with respect to Defendants' *Daubert* motions. Regardless, the Court does not believe such a hearing is necessary, as the parties submitted detailed briefing containing the necessary expert materials for the Court to issue a ruling. *See generally State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.,* 980 F. Supp. 2d 1031, 1045 (N.D. Ind. 2013) ("A district court enjoys wide latitude in performing its gatekeeping function and deciding how to determine the reliability of an expert's testimony," and "[the] Court is not required to conduct a *Daubert* hearing.") (internal citations omitted).

Defendants Zarnke and SANI improperly attempted to add Dr. Bilimoria as a witness after the Rule 26(a)(2)(B) disclosure deadline. [273, 301].

Plaintiffs' Motion *in Limine* No. 20 is granted. The Court finds that Dr. Bilimoria's testimony would be needlessly cumulative of the testimony of the other defense experts and that, pursuant to Rule 403, Defendants Dr. Zarnke and SANI will not be permitted to call both Dr. Kokoszka and Dr. Bilimoria.

### 1. *Dr. Bilimoria's testimony would be needlessly cumulative*

As noted above, the Court may exclude relevant evidence under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. It is because of this principal that courts in this district generally prohibit a party from offering multiple experts on the same subject. *Sunstar, Inc.*, 2004 WL 1899927, at *25.

Plaintiffs argue that Dr. Bilimoria's opinions with respect to whether Dr. Zarnke deviated from the standard of care are exactly the same as those of Dr. Kokoszka, Defendants Dr. Zarnke and SANI's other disclosed expert witness, and contend that allowing these Defendants to present multiple general surgery experts would be needlessly cumulative and unfairly prejudicial. [273] 4-5.

In response, Defendants Dr. Zarnke and SANI make almost no attempt to distinguish the substance of the experts' opinions. Indeed, at oral argument, defense counsel appeared to expressly concede that the experts' opinions are "largely the

same" in terms of their standard of care conclusions, and counsel could not point to any specific example of a difference in opinion. In case there is any doubt, the Court has reviewed Dr. Kokoszka's and Dr. Bilimoria's reports and finds that both experts would present nearly identical opinions on the same subject, that is, that Dr. Zarnke did not deviate from the standard of care of a reasonably careful general surgeon.[13]

Despite Dr. Bilimoria's opinions being apparently duplicative of Dr. Kokoszka, Defendants Dr. Zarnke and SANI advance several arguments as to why Dr. Bilimoria's testimony would not be cumulative and should be permitted. Each of the Defendants' arguments fails.

Defendants Dr. Zarnke and SANI first attempt to distinguish the experts by pointing to their different credentials,[14] and argue that the experts' reports are not identical, because each expert gets to their ultimate conclusions in different ways and from different perspectives. [279] 5-6. But whether or not the two experts have different perspectives "does not diminish the fact that defendants propose to call two experts who will render essentially the same opinions." *See Hall v. Hall*, No. 14 C 6308, 2018 WL 1695365, at *5 (N.D. Ill. Apr. 7, 2018) (concluding that the presentation of two experts on the defendants' compliance with the standard of care would amount to the needless presentation of cumulative evidence, despite the experts' different perspectives and specialties). Both Dr. Kokoszka and Dr. Bilimoria

---

[13] For example, both experts opine that Dr. Zarnke acted within the standard of care by recommending and proceeding to surgery as opposed to first proceeding with antibiotic treatment. [273-1] 14; [273-2] 18. Both experts also offer their opinion that Dr. Zarnke did not cause or contribute to any of Ms. Kaepplinger's injuries. [273-1] 16; [273-2] 20.

[14] Both Dr. Kokoszka and Dr. Bilimoria are board certified in general surgery, the same certification as Dr. Zarnke, but Dr. Kokoszka is also board certified in colorectal surgery.

are general surgeons, and both would testify as to the standard of care of a reasonably careful general surgeon, and the Court cannot see how their different credentials makes their testimony any less cumulative.[15]

Second, Defendants Dr. Zarnke and SANI argue that the prohibition in this district against multiple experts on the same subject applies to *each individual party*, and that because SANI and Dr. Zarnke are separate defendants, they each are entitled to call their own experts. [279] 4-5. Relatedly, Defendants Dr. Zarnke and SANI also argue that Dr. Bilimoria's testimony would not be cumulative because the allegations against SANI are "broader" than those against Dr. Zarnke, because the allegations against SANI are based on a *respondeat superior* theory of liability for the conduct of both Dr. Zarnke and Dr. Michelotti as its agents, and Dr. Michelotti is a separate defendant represented by separate counsel. [*Id.*]

Defendants Dr. Zarnke and SANI are correct that the rule against multiple experts on a particular subject is often presented as one-expert per-subject *per-party*.

---

[15] Defendants cite two District Court cases from this Circuit, *Noffsinger v. Valspar Corp.* and *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.,* for the proposition that multiple experts testifying on the same subject is not considered cumulative when they have different specialties and perspectives. [279] 5-6. The cases are distinguishable, however: in *Noffsinger,* the court found an expert would not be cumulative because she, unlike the other proposed expert, had a specialty in the particular condition suffered by the Plaintiff, No. 09 C 916, 2013 WL 12340488, at *7 n. 6 (N.D. Ill. Jan. 4, 2013); and in *In re Yasmin & Yas,* while the allegedly cumulative experts each shared "similar broad conclusions," each was to testify about certain epidemiological studies from a particular area of expertise and with different *firsthand* knowledge of the studies. No. 3:09-CV-10012-DRH, 2011 WL 6740363, at *10 (S.D. Ill. Dec. 22, 2011). There is no suggestion here that either Dr. Kokoszka or Dr. Bilimoria have unique firsthand knowledge, experiences, or specialties that differentiates their opinions. Further, it is Dr. Kokoszka who has the additional certification in colorectal surgery, and Defendants do not offer any explanation as to how Dr. Bilimoria's lack of that particular certification impacts his opinions as to the standard of care of a general surgeon such that his testimony would not be cumulative.

*See, e.g., In re Testosterone Replacement Therapy*, 2018 WL 1316724, at \*2 ("this district's local rules—specifically the final pretrial order form—have for decades contained a provision stating that "[o]nly one expert witness on each subject *for each party* will be permitted to testify absent good cause shown.") (citing N.D. Ill. LR 16.1.1, Final Pretrial Order form at n. 7) (emphasis added); *see also GuideOne Mut. Ins. Co. v. Berghaus Organ Co.,* No. 07 C 50037, 2011 WL 1402869, at \*3 (N.D. Ill. Apr. 13, 2011) (denying plaintiff's motion *in limine* and allowing separate defendants to each call their own mechanical engineering and causation expert witnesses).

However, this Court finds, based on its review of the case law, that the general rule against multiple expert witnesses on the same subject is more properly understood as "one-expert per-subject *per-side*." Multiple courts in this district have barred *groups* of defendants or plaintiffs on the same side from calling multiple expert witnesses on the same subject. *See, e.g., Dahlin v. Evangelical Child & Fam. Agency*, No. 01 C 1182, 2002 WL 31834881, at \*5 (N.D. Ill. Dec. 18, 2002) (limiting the two individual plaintiffs to one expert on a subject); *Harbor Ins. Co. v. Cont'l Bank Corp.*, No. 85 C 7081, 1991 WL 222260, at \*8 (N.D. Ill. Oct. 25, 1991) (granting defendants' motion *in limine* to limit the two plaintiff insurance companies to one expert on a topic); *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 WL 88973, at \*11 (N.D. Ill. Jan. 13, 2005) (holding that a group of defendants, which included an investment fund and individual officers of the fund, were limited to one expert where their two proposed experts had opinions that were "closely related" and overlapped).

13

Further, the case Defendants cite, *GuideOne Mut. Ins. Co.*, is distinguishable. In that case, the two defendants, Berghaus Organ Company and G&G Electric, Inc., were unrelated entities defending against separate negligence claims, and each sought to call a mechanical engineering and causation expert in their respective case. *See GuideOne Mut. Ins. Co.*, No. 07 C 50037, 2011 WL 1402869, at *3; see also [301-3]. The court found that there was "no indication that either defendant will offer cumulative expert testimony within each defendant's respective case," and further found it would be prejudicial to require one of the defendants to proceed without its own expert given the "potential conflict of interest at trial between the two defendants." *Id*. Here, although SANI is technically a separate party with its own defense, its liability is entirely dependent on Dr. Zarnke's and Dr. Michelotti's conduct as its agents. The Defendants' interests are thus aligned and SANI's defense is essentially identical to that of the individual defendants—that they were not medically negligent in their treatment of Ms. Kaepplinger. Further, as already discussed above, unlike in *GuideOne Mut. Ins. Co.* there is a strong indication here that the two experts' testimony would be entirely cumulative.

Based on the case law and the relevant rules of evidence, the Court is not persuaded that Dr. Zarnke and SANI should be permitted to call cumulative expert witnesses to offer substantially the same opinions on the same subjects, merely because they are technically separate defendants. The question under Rule 403 is not whether the allegations or defendants are separate, but whether *the evidence* would be needlessly cumulative and risk unfair prejudice. Here, allowing SANI and Dr.

14

Zarnke to present duplicative expert opinion evidence as to the standard of care would do just that: it would present needlessly cumulative testimony that could cause unfair prejudice in the jury resorting to "'counting heads' rather than evaluating the quality and credibility of the testimony." *Sunstar, Inc.*, 2004 WL 1899927, at *25.

Finally, insofar as Dr. Bilimoria's opinions are broader than Dr. Kokoszka's because they also cover Dr. Michelotti, his opinions with respect to Dr. Michelotti are likewise cumulative of Dr. Michelotti's expert witness, Dr. Altimari. Here again, Defendants Dr. Zarnke and SANI do not attempt to distinguish the substance of the expert opinions,[16] but instead argue that SANI should not be forced to rely on a co-defendant, who is represented by separate counsel, to present expert testimony that goes to its own liability. [279] 5. But the fact that Dr. Altimari will be called by a co-defendant with separate counsel does not make Dr. Bilimoria's testimony any less cumulative, nor does it lessen the risk of prejudice to Plaintiffs. Insofar as there is any risk of prejudice to SANI by having to rely on a co-defendant's expert, counsel for SANI will have the full opportunity to question Dr. Altimari should they feel that he has not adequately presented testimony regarding Dr. Michelotti which could impact SANI's liability.[17]

---

[16] Nor could they, as the Court has reviewed Dr. Altimari's report and finds Dr. Bilimoria's opinions with respect to Dr. Michelotti are duplicative. Both experts offer nearly identical opinions that Dr. Michelotti's post-operative treatment of Ms. Kaepplinger and the manner in which he followed up on her care did not fall below the standard of care of a reasonably careful general surgeon. [174-1] 7-8; [273-2] 18-19

[17] SANI's argument that it should not be forced to rely on the expert of a co-defendant represented by separate counsel is also undercut by the fact that SANI never disclosed its own Rule 26(a)(2)(B) expert to testify as to whether Dr. Michelotti deviated from the standard of care. Rather, in its joint disclosure with Dr. Zarnke, SANI designated only Dr. Kokoszka, whose report was limited to the subject of Dr. Zarnke. SANI appears to have previously been

In sum, Dr. Bilimoria's testimony is unnecessarily cumulative of Dr. Kokoszka and Dr. Altimari, and there is a significant risk that allowing Defendants Dr. Zarnke and SANI to present multiple experts on the exact same subject will unfairly prejudice the Plaintiffs.

### 2. Defendants Dr. Zarnke and SANI's request to choose between Dr. Bilimoria and Dr. Kokoszka is denied without prejudice

At the conclusion of the continued Final Pretrial Conference and in light of the Court's ruling on the record granting this particular motion *in limine*, counsel for Defendants Dr. Zarnke and SANI asked that they be allowed to pick which expert witness—between Dr. Kokoszka and Dr. Bilimoria—they call at trial. Plaintiffs objected to this request on two bases: the cumulative nature of Dr. Bilimoria's testimony as to both Dr. Kokoszka and Dr. Altimari, and the untimely and improper disclosure by Defendants Dr. Zarnke and SANI of Dr. Bilimoria under Rule 26(a)(2)(B). Counsel for Dr. Michelotti did not join this request and stated that Dr. Michelotti only intended to call Dr. Altimari.

It is true that when a party or parties *properly* disclose multiple Rule 26(a)(2) expert witnesses on the same subject, and a court subsequently finds one or more of the experts would be cumulative, the court will generally allow the party to choose which of its designated experts it ultimately calls at trial. *See, e.g., Dahlin*, 2002 WL 31834881, at *5; *Abrams*, 2005 WL 88973, at *11. But this case is distinguishable in

---

willing to rely on its co-defendants RMH's and Dr. Michelotti's disclosed expert witnesses to testify as to Dr. Michelotti's conduct, and any potential prejudice in it having to rely on a co-defendant for its defense now is of SANI's own making by failing to properly disclose its own expert.

several respects. First, the scope of Dr. Bilimoria's expert report is broader than that of Dr. Kokoszka, because Dr. Bilimoria's expert report covers *both* Dr. Zarnke and Dr. Michelotti, whereas Dr. Kokoszka's covers only Dr. Zarnke. This means that, even if Defendants Dr. Zarnke and SANI were allowed to call Dr. Bilimoria instead of Dr. Kokoszka, there would still be the potential for testimony that is cumulative to that of Dr. Michelotti's expert, Dr. Altimari. Second, this is not a case where a party is asking to pick between two or more experts previously included on their timely Rule 26(a)(2) disclosures. Indeed, Plaintiffs specifically objected to Defendants Dr. Zarnke and SANI choosing Dr. Bilimoria over Dr. Kokoszka because of the belated and piecemeal nature of their expert disclosure past the deadline entered by the Court.

Although the Court heard brief oral argument on this request when it was made at the Final Pretrial Conference, given the distinguishable history of the expert disclosures in this case and that the trial date has subsequently been reset to September 12, 2022, there are issues that require further clarification by the parties before the Court can rule on whether Defendants Dr. Zarnke and SANI should be permitted to call Dr. Bilimoria instead of Dr. Kokoszka. The Court thus denies Defendants Dr. Zarnke and SANI's request to choose between the two experts without prejudice, with leave for Defendants to formally move to call Dr. Bilimoria in lieu of Dr. Kokoszka should they decide to continue to seek this relief.

If they do intend to pursue this issue, Defendants Dr. Zarnke and SANI are to file a motion by February 7, 2022, to include: (a) the scope of Dr. Bilimoria's proposed testimony, specifically whether his contemplated testimony will include both Dr.

Zarnke and Dr. Michelotti or be limited to Dr. Zarnke; and (b) why Defendants Zarnke and SANI should be permitted at this stage of the case to call Dr. Bilimoria in lieu of Dr. Kokoszka under the Federal Rules and what standard the Court should apply. Plaintiffs are to respond by February 14, 2022. No reply will be filed unless requested by the Court. The parties' briefing should account for the Court's ruling above pursuant to Rule 403, as well as the effect the rescheduled trial date has on the dispute. Finally, if Defendants Dr. Zarnke and SANI have determined that they will call only Dr. Kokoszka, they should promptly notify the Court and Plaintiffs of their decision as that will moot the need for further motion practice on this issue.

In sum, Plaintiff's Motion *in Limine* No. 20 is granted—Defendants Dr. Zarnke and SANI are barred under Rule 403 from calling both Dr. Kokoszka and Dr. Bilimoria at trial. As to whether Defendants Dr. Zarnke and SANI will be permitted to call Dr. Bilimoria *instead* of Dr. Kokoszka, that request is denied without prejudice pending further motion practice as outlined above.

## B. Defendants Zarnke and SANI's Motion *in Limine* No. 16

In this motion *in limine*, Defendants Dr. Zarnke and SANI seek to bar Plaintiffs' expert Dr. Braveman from testifying as to certain opinions in his report. Plaintiffs have designated Dr. Braveman to offer his opinion that Dr. Zarnke failed to act as a reasonably careful general surgeon in his treatment of Ms. Kaepplinger. In general, Dr. Braveman's opinion is that Dr. Zarnke deviated from the standard of care because he proceeded directly to surgery to address Ms. Kaepplinger's diverticulitis and colon abscess, when instead he should have first administered a

course of antibiotic therapy to see if her condition improved. [268] 17; [221-7]; [283]

1. As part of his opinion, Dr. Braveman states that:

> "After the conclusion of the antibiotic therapy and six weeks after the symptoms had resolved, a reasonably careful general surgeon would have had a colonoscopy performed to exclude the possibility of malignancy. At that point, having completed antibiotic therapy, the reasonably careful general surgeon would then have been in a position to determine whether surgery was necessary. Further, Dr. Randall Rhodes, the radiologist who read the August 13, 2015 CT recommended follow up. DR. ZARNKE failed to act as a reasonably careful general surgeon in that he failed to follow up the CT with administration of antibiotics and a colonoscopy."

[221-7] 12-13. Dr. Braveman further indicates in his report that "it was possible that Angela was suffering from colon cancer" and that Dr. Zarnke should have completed the colonoscopy to "confirm or disprove the existence of cancer." [*Id.*] at 13 n. 1.

Defendants argue that Dr. Braveman should not be permitted to testify as to his specific opinion that Dr. Zarnke deviated from the standard of care by failing to have a colonoscopy performed. The Defendants point to Dr. Braveman's testimony that the failure to do a colonoscopy did not, itself, result in any injury to Ms. Kaepplinger, and note that there is no evidence that she suffered from cancer. [268] 18. Defendants argue that this lack of harm makes Dr. Braveman's opinion testimony about the failure to perform a colonoscopy inadmissible, because, under Illinois law, "for opinions on the deviation of the standard of care to be admissible at trial, the negligent conduct/deviations must be *causally linked to the claimed injury*." [*Id.*] (citing *Seef v. Ingalls Mem. Hosp.*, 311 Ill. App 3d 7, 15 (1st Dist. 1999) (emphasis added). In other words, Defendants argue that, under Illinois law, an expert witness may only testify about particular deviations from the standard of care when there is

also expert evidence that such deviations caused or contributed to cause the plaintiff's claimed injury.

The Court agrees with Defendants' read of Illinois law on this issue, and finds that it resolves the instant motion in their favor.[18] In order to prevail in a medical malpractice action in Illinois, the plaintiff has the burden of proving (a) the proper standard of care by which the defendant physician's conduct should be measured, (b) a failure to comply with the standard of care, and (c) a resulting injury proximately caused by the defendant's deviation from the standard of care. *See generally Purtill v. Hess*, 111 Ill. 2d 229, 241-242, 489 N.E.2d 867, 872 (1986). Further, in order to establish these elements, including causation, Illinois courts generally require the plaintiff present expert medical testimony. *See id.*; *see also Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008) ("Generally, these elements must be established through expert testimony."). The Seventh Circuit has held that Illinois' requirement that plaintiffs must present expert testimony to establish medical negligence is not a procedural rule, but rather is substantive law and is therefore binding on federal courts. *See Murrey v. United States*, 73 F.3d 1448, 1456 (7th Cir.1996).

Under these rules, a medical malpractice plaintiff generally may not offer evidence of a defendant's particular deviation from the standard of care where there is not corresponding evidence that that deviation proximately caused or contributed

---

[18] Defendants do not expressly address why Illinois law, as opposed to federal law, governs this motion *in limine*, though they appear to contend it does because they cite only state court cases. Defendants do suggest in a separate motion *in limine* in the same filing that state law controls when the issue "concerns proof of the applicable standard of care." [268] 15. Plaintiffs' response does not address the issue of what law the Court should apply to this motion. Regardless, as discussed further *infra*, the Court finds Illinois law does apply.

to cause plaintiff's claimed injury. *See, e.g., Guski v. Raja,* 409 Ill. App. 3d 686, 700-702, 949 N.E.2d 695, 708-709 (2011). The *Guski* case cited by Defendants is particularly instructive. The plaintiff, the administrator of an estate for a patient who died after an emergency room visit, sought to have their standard of care expert testify that the defendant doctor deviated from the standard of care by, among other things, failing to accurately chart the patient's symptoms. *Id.* at 687, 701, 949 N.E.2d at 697, 709. The trial court granted a defense motion *in limine* to prevent the specific expert testimony related to the failure to chart the patient's symptoms, finding it was irrelevant because "none of plaintiff's experts would testify that charting deficiencies caused [the patient's] death." *Id.* at 701, 949 N.E.2d at 709. The Appellate Court of Illinois affirmed the decision, noting that the trial court was "well within its discretion to conclude that the testimony was irrelevant in proving negligence absent testimony that the alleged deviation proximately caused [the patient's] death." *Id.* at 702, 949 N.E.2d at 709; *see also Seef,* 311 Ill. App. 3d at 16, 724 N.E.2d at 122 (finding that a trial court did not abuse its discretion in barring a witness from testifying as to deviations of the standard of care by the defendant hospital's nurses after the court had found those deviations were not the proximate cause of the plaintiff's injuries).

The circumstances here are comparable to *Guski*. Dr. Braveman's report points to multiple ways in which he believes Dr. Zarnke deviated from the applicable standard of care. For some of those alleged deviations, Plaintiffs have corresponding expert testimony that the deviations proximately caused Plaintiffs' claimed injuries. However, Plaintiffs have not presented any expert testimony that the failure to

perform a colonoscopy specifically was a proximate cause of any injury. In fact, Dr. Braveman admitted the opposite. [268-4] 41. In the absence of expert testimony causally linking the failure to perform a colonoscopy to a claimed injury, the testimony is irrelevant under Illinois law.

Plaintiffs argue in response that they should be allowed to present to the jury the "entire course of treatment that adhering to the standard of care would entail," and that that Dr. Braveman believes a colonoscopy was a necessary part of that course of care. [283] 2. Plaintiffs cite no authority for this argument, however, nor do they address the cases cited by Defendants. [238] 2-3. Regardless, Plaintiffs have not alleged, nor is there any expert testimony, that Dr. Zarnke's "entire course of care" deviated from the applicable standards and caused Plaintiff's injuries. Rather, Plaintiffs have alleged that Dr. Zarnke undertook specific actions and omissions in his treatment of Ms. Kaepplinger which caused her injuries. [130] 15 ¶8. Under the Illinois substantive law on this issue,[19] Plaintiffs may only present testimony on those specific actions or omissions that deviated from the standard of care where there is also evidence that such deviations caused plaintiff's claimed injuries. *Compare Guski,* 409 Ill. App. 3d at 701, 949 N.E.2d at 709, *with Williams v. Mary Diane Schwarz,*

---

[19] Although the Court holds that Illinois law resolves this issue, Defendants suggest in passing that the testimony is also inadmissible under Federal Rules of Evidence 402 and 403, and the Court agrees. First, the evidence is irrelevant under Illinois substantive law, and irrelevant evidence is inadmissible under Rule 402. *See Fed. R. Evid.* 402; *see also In re Air Crash Disaster,* 701 F.2d at 1193 (whether evidence is relevant may be ascertainable "by reference to the substantive law of the state."). Second, even if the testimony had some limited probative value as part of presenting Dr. Zarnke's entire course of care to the jury, the Court finds that it would be unfairly prejudicial under Rule 403 for the jury to hear testimony about a deviation from the standard of care that Plaintiffs do not contend caused any injury.

*P.A.*, No. 15 C 1691, 2018 WL 2463391, at *7-8 (N.D. Ill. June 1, 2018) (denying defendant's motion to bar testimony as to particular deviations from the standard of care, holding that the testimony was relevant, despite the lack of specific evidence that those deviations caused any injury, because the plaintiff had alleged that it was the defendant's "totality of care over a nine-month period, and not any one action, that caused his injuries.").

In sum, the Court finds the testimony irrelevant and inadmissible under both Illinois substantive law and the Federal Rules of Evidence, and therefore grants Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 16. Dr. Braveman will not be permitted to testify to his specific opinions that Dr. Zarnke deviated from the standard of care by failing to have a colonoscopy performed.

## C. Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 23

Defendants Dr. Zarnke and SANI move, pursuant to *Daubert* and Rule 702, to bar Plaintiffs from calling their proposed expert David Gibson at trial. [270].

Mr. Gibson is a vocational economist whom Plaintiffs have disclosed under Rule 26(a)(2)(B) to provide expert opinion testimony as to Ms. Kaepplinger's alleged loss of earnings capacity as a result of the injuries she allegedly sustained as a result of Defendants medical negligence. [270-1]; [292] 1. Mr. Gibson provided a detailed "Vocational Economic Assessment" ("VAE") report which lays out his opinions, methodology, and the underlying data and assumptions he relied upon. [270-1]. Mr. Gibson ultimately concludes that Ms. Kaepplinger sustained a loss of earning capacity in the range of $1,055,141 to $1,218,095. [*Id.*] at 1.

As noted above, courts in this Circuit engage in a three-step inquiry in order to determine whether expert evidence is relevant and reliable: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Rossi*, No. 10 C 50240, 2013 WL 1632065, at *2 (citing *Myers*, 629 F.3d at 644).

For the following reasons, the Court finds that Plaintiffs have met their burden in establishing that Mr. Gibson satisfies the *Daubert* standard, and that he is qualified to offer expert opinion testimony.

### 1. *Mr. Gibson's methodology is reliable and generally accepted*

Defendants argue that Mr. Gibson's report and expert testimony fail to satisfy the *Daubert* standard, because his methodology is unreliable and is not peer reviewed or generally accepted in the field. [270] 3.[20] As a general matter, Mr. Gibson's methodology for creating the VAE for Ms. Kaepplinger and calculating her loss of earning capacity involved three main steps: (1) a determination of Ms. Kaepplinger's average pre-injury and post-injury earning capacity; (2) a determination of Ms. Kaepplinger's work-life expectancy, in other words, how long she would reasonably have been expected to earn money; and (3) a calculation of Ms. Kaepplinger's "loss of lifetime expected earnings" based on her earning capacity and work-life expectancy,

---

[20] Whether a proposed expert's methodology has been peer reviewed or is generally accepted in his field are some of the factors a court should consider in evaluating whether an expert's testimony is reliable. *See Baugh v. Cuprum S.A. de C.V., 845 F.3d 838, 844 (7th Cir. 2017)*

which includes factoring in the "real growth rate" of the future earnings and an offset, or "discount rate," to reduce the future earnings to their present day value. [270] 4; [270-1] 6-7, [292] 4. Mr. Gibson relied on information from Ms. Kaepplinger, Dr. Sewick's neuropsychological evaluation, and statistical data from the U.S. Census Bureau's American Community Survey ("ACS") for individuals that fit Ms. Kaepplinger's demographic profile. [292] 4.

Defendants attack Mr. Gibson's methodology at all three steps, relying primarily on a recent case from the U.S. District Court for the Northern District of Indiana, in which the court excluded Mr. Gibson from testifying at trial after finding his methodology unreliable under Rule 702 and *Daubert. See generally Sturgis v. R & L Carriers, Inc.*, No. 3:19-CV-440 DRL-MGG, 2021 WL 3578746 (N.D. Ind. Aug. 13, 2021). In *Sturgis,* the plaintiff was a truck driver who died in an accident, and Mr. Gibson prepared a VAE report to estimate the plaintiff's lost earning capacity following the same general three-step framework as he did here. *Id* at *1. The *Sturgis* court took issue with several specific aspects of how Mr. Gibson arrived at his loss of earnings figures, and also found that he had not provided support that his methodology was generally accepted or peer reviewed. *Id.* at *4-6.

In response, Plaintiffs argue that the *Sturgis* case is an outlier decision, and that Mr. Gibson's methodology has not only been peer reviewed, but has been repeatedly accepted by courts across the country including in this Circuit. [292] 4-7. Plaintiffs' opposition brief also attaches a detailed affidavit by Mr. Gibson, in which he provides further explanation and support for his methods and conclusions, and

responds to Defendants' specific arguments. [292-2]. Mr. Gibson also provides his own explanation for why he believes it was an error for the *Sturgis* court to exclude his testimony. [292-2] 25.[21]

As a threshold matter, the Court disagrees with Defendants and the *Sturgis* court that Mr. Gibson's methodology has not been peer reviewed or that it is not generally accepted. The Defendants claim, and the *Sturgis* court found, that many if not most of the sources that Mr. Gibson cites to in support of his methodology are articles or presentations that were authored or created by Mr. Gibson himself, or by his colleagues from his firm. *See, e.g.*, [270] 6, [303] 5; *Sturgis, Inc.*, 2021 WL 3578746 at *5. However, whether or not these articles or presentations were authored or created by Mr. Gibson himself or his colleagues is beside the point. Plaintiffs and Mr. Gibson point to several examples of his and his colleagues' works and presentations being subject to peer review. For example, Mr. Gibson asserts that an article about

---

[21] In their reply brief, Defendants argue Mr. Gibson's affidavit is improper under Rule 26 and should be disregarded by the Court, because it is an attempt to add additional bases and sources for Mr. Gibson's opinions that were not included in his original report. [303] 2. But there is no requirement that Mr. Gibson's original report "cover any and every objection or criticism of which an opposing party might conceivably complain," and Mr. Gibson was not required to "stand mute in response to an opposing party's *Daubert* motion." *See Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006). Defendants have challenged Mr. Gibson's methodology and the support for his conclusions, and it is proper for him to submit an affidavit in response. *Id.* Although it would be inappropriate for Mr. Gibson to introduce completely new or different opinions in his supplemental affidavit, he is free to provide "more information and elaboration on opinions previously expressed" to respond to Defendants' motion. *Emig v. Electrolux Home Prod. Inc.*, No. 06-CV-4791 (KMK), 2008 WL 4200988, at *3 (S.D.N.Y. Sept. 11, 2008). While Defendants complain that Mr. Gibson's affidavit "contradicts" his sworn deposition testimony, they do not point to any specific opinions that are new or different. The Court's read of Mr. Gibson's affidavit is that it does little more than provide additional information and elaboration for his opinions and defends his methods, and the Court can properly consider it in resolving this motion. Defendants will be free to cross-examine and attempt to impeach Mr. Gibson as to any alleged inconsistencies between his affidavit, report, or deposition testimony.

his vocational economic rationale method was subject to peer review and published in a journal for vocational economic experts, that he has given peer-reviewed presentations on the use of ACS to calculate lifetime earnings, and that his works on the impact of disability on earnings and work-life expectancy have been presented at multiple conferences and his findings subject to peer review in the *Neurorehabilitation* and *Brain Injury* journals. [292] 3-4; [292-2] 4, 6-7.

That many or even most of the articles cited by Mr. Gibson in support of his method are authored by himself or his colleagues does not change the fact that they have apparently been repeatedly accepted for publication in peer-reviewed journals and presented in peer-reviewed forums.[22] The Court has no reason to doubt Plaintiffs and Mr. Gibson's claims or examples of his work being subject to peer review, and Defendants' reply does not address the substance of Plaintiffs' or Mr. Gibson's arguments on this point, other than to again object that the sources they cite were authored by Mr. Gibson or his colleagues. [303] 5.

Further, as Plaintiffs and Mr. Gibson point out in response to Defendants' motion, courts have generally accepted Mr. Gibson's testimony and his methodology on dozens if not hundreds of occasions. [292] 6-7. Indeed, multiple courts in the Seventh Circuit have admitted Mr. Gibson's testimony using the same vocational

---

[22] The Court has accepted, for the sake of argument, Defendants' and the *Sturgis* Court's position that most, if not all the articles relied upon by Mr. Gibson to support his method are self-authored or authored by his colleagues. However, it is not clear that this is necessarily the case, as Mr. Gibson's affidavit states that his report and deposition testimony cite to other sources published by other authors [292-2] 6, 28. The Court also credits Mr. Gibson's point that many of the self-authored articles he cites themselves refer to other sources for support, and he has often cited his own articles collecting theses sources out of efficiency. *Id.*

economic rationale method that he employs in this case, including in a case from the Western District of Wisconsin that was decided after *Sturgis*. *See Eliason v. Superior Ref. Co. LLC*, No. 19-CV-829-WMC, 2021 WL 4820252, at *6 (W.D. Wis. Oct. 15, 2021) (finding Mr. Gibson's opinions and methodology reliable enough to survive a *Daubert* motion); *Rossi*, 2013 WL 1632065, at *2-4 (N.D. Ill. Apr. 16, 2013) (same); *Dahl v. Hofherr*, No. 3:14-CV-1734-MGG, 2016 WL 8668498, at *8-9 (N.D. Ind. Nov. 18, 2016) (same); *see also Barr v. United States*, No. 315-CV-01329-DRH-PMF, 2018 WL 4815413, at *6 (S.D. Ill. Oct. 4, 2018) (commenting that Mr. Gibson's methodology was reliable).

In the face of this apparent weight of authority approving of Mr. Gibson's methodology, Defendants again point to the *Sturgis* decision. Defendants note the court there declined to follow the previous cases in the Seventh Circuit approving of Mr. Gibson's methodology based on its view that the "varied circumstances of [those] cases make them less persuasive here." *Sturgis*, 2021 WL 3578746, at *7 n. 4. Counsel for Defendants Dr. Zarnke and SANI expanded on this idea at oral argument, and argued that the fact that Mr. Gibson's methodology may have been found reliable or admissible in the past, in cases which may not be directly comparable, says nothing of whether his methodology is reliable and admissible here. Defendants suggest that in reality, Mr. Gibson changes his methodology depending on the case and depending on the data he has access to, which renders his opinions unreliable. [303] 3-4.

It would seem obvious that Mr. Gibson's precise steps, approach, and means of calculation may vary in different cases based on the particular circumstances of the

individual plaintiff's claims, injuries, or the available records, but that does not render his overall method unreliable. The fact remains that, in each of the cases cited above where courts accepted Mr. Gibson as an expert, he appears to have utilized the same general methodology of creating a VEA based on preinjury and postinjury earning capacity, work-life expectancy, and lifetime loss, which he does by relying on the individual plaintiff's information and demographics information and by utilizing statistical data from the ACS.

The Court is mindful of Defendants' point that this Court is to conduct an independent inquiry and *Daubert* analysis of Mr. Gibson's methods, but it is difficult for the Court to conclude that Mr. Gibson's methodology is not reliable and generally accepted when the specific VEA process he employed in this case has been repeatedly approved of by courts in the Seventh Circuit, including this district. To be sure, this is not to say Mr. Gibson's methodology has not been subject to any criticism.[23] However, the Court's inquiry at the *Daubert* stage is not whether an expert's method is beyond any criticism. Rather, "[t]he principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science." *Eliason*, No. 19-CV-829-WMC, 2021 WL 4820252, at *6 (W.D. Wis. Oct. 15, 2021) (quoting *Tuf Racing Products, Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)). Based on its review of Mr. Gibson's methodology and the cases in this Circuit approving of it, the Court cannot say his approach is the kind of "junk science" that *Daubert* is meant to protect against.

---

[23] *See Sturgis*, 2021 WL 3578746, at *6 (citing a journal article critical of the use of Mr. Gibson's method, primarily in the context of disability cases.)

29

In sum, in this case and on this record the Court is not persuaded by the reasoning of the *Sturgis* decision. Given the acceptance of Mr. Gibson's methodology by courts in the Seventh Circuit, along with the numerous examples across other courts, the Court finds there is no basis to exclude his testimony as unreliable. Defendants will of course be free to cross-examine Mr. Gibson on any purported weaknesses or deficiencies in his methodology, and can argue to the jury on why they believe his opinions should be disregarded.

> 2. *The remainder of Defendants' specific objections to Mr. Gibson's methods go to the weight of his testimony, and not its admissibility.*

In addition to generally attacking his methodology in reliance on *Sturgis*, Defendants make several specific complaints about Mr. Gibson's methods and the facts and data upon which he relies in reaching his ultimate conclusions. However, each of the Defendants' arguments fails. Although Defendants present their arguments in terms of issues with Mr. Gibson's methodology, their complaints are really based on objections to the underlying factual foundation of Mr. Gibson's opinions, including the assumptions he has made as part of his calculations. "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013). "The Court must be mindful . . . not to usurp the jury's role of determining the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis.'" *Sys. Dev.*

*Integration, LLC v. Computer Sci. Corp.*, 886 F. Supp.2d 873, 882 (N.D. Ill. 2012) (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011)).

Here, Defendants make a number of complaints that ultimately go the factual underpinnings and assumptions in Mr. Gibson's analysis. For example, the Defendants object that Mr. Gibson, when calculating Ms. Kaepplinger's pre-injury earnings, relied on statistical data from ACS for individuals fitting her profile because he had not received a full five years of W-2s and tax returns showing her actual earnings. [270] 10-11.[24] Defendants also complain that when Mr. Gibson calculated Ms. Kaepplinger's potential post-injury earnings and work-life expectancy, he failed to properly account for Ms. Kaepplinger's potential for future work. [*Id.*] 5-6. Defendants further object that, when Mr. Gibson was calculating the present dollar amount of Ms. Kaepplinger's future earnings, he selected a particular investment vehicle to determine the "discount rate" of growth despite him not being qualified to offer investment advice or make such an investment determination. [*Id.*] 7-8.

In addition, Defendants take particular issue with Mr. Gibson's "opinions" with regards to Ms. Kaepplinger's future impairments as a result of her alleged injuries, and how those impairments impact her ability to work and potential for future earnings. [*Id.*] at 8-9; [303] 3. Specifically, Defendants argue that Mr. Gibson, who is not a medical doctor and who did not review or rely on any medical records or reports, is not qualified to make the determination that Ms. Kaepplinger has a physical

---

[24] Mr. Gibson's did receive two years of records from Ms. Kaepplinger and indicated in his report that her actual earnings were comparable to the statistical average. [270-1] 5.

impairment, including lifting restrictions, that would impact her future work. [303] 3. Defendants also challenge Mr. Gibson's "opinion" that Ms. Kaepplinger has mental and cognitive limitations and a "50% permanent disability." [270] 8-9. While Mr. Gibson did review Dr. Sewick's neuropsychological report, he admitted that the 50% number which was part of his calculation did not come from Dr. Sewick, but was based on his own "professional judgement." [*Id.*]

Regardless of the merits of the Defendants' criticisms, each point of objection goes to the factual underpinning of Mr. Gibson's analysis and ultimate conclusion, not whether his methodology is reliable. That Mr. Gibson relied on certain data sets over others, or made certain assumptions about Ms. Kaepplinger's future ability to work, or what investment vehicle to use, are all factual assumptions and determinations that go to the weight of his testimony, and not its admissibility. *See, e.g., Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis."). Further, what Defendants describe as Mr. Gibson making medical or neuropsychological "opinions" appears to the Court to be nothing more than Mr. Gibson doing precisely what a vocational economist, who is not a doctor, would do to make calculations about an individual's potential for future earnings. That is, Mr. Gibson is making certain underlying factual assumptions based on his

conversations with Ms. Kaepplinger and his review of certain records in order to establish a factual foundation for his ultimate opinions.

Defendants are free to criticize and cross-examine Mr. Gibson on his assumptions, the data he relied on, and the factual foundation for his decisions, but the Court will not usurp the jury's role in "determining the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis.'" *Sys. Dev. Integration, LLC*, 886 F. Supp.2d at 882 (quoting *Bielskis*, 663 F.3d at 896); *see also Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

In sum, the Court finds that Defendants' arguments that Mr. Gibson is not qualified as an expert are without merit, and that Plaintiffs sufficiently demonstrated that his testimony satisfies the *Daubert* standard. Defendants' Motion *in Limine* No. 23 is therefore denied.

### D. Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24

Defendants Dr. Zarnke and SANI's final motion *in limine,* also brought pursuant to *Daubert*, seeks to bar or limit the testimony of Plaintiffs' neuropsychology expert Dr. Sewick. Plaintiffs retained Dr. Sewick to conduct neurophysiologic testing of Ms. Kaepplinger, which he did on two occasions, after which he prepared reports of his findings. [293] 3-4. Dr. Sewick concluded that Ms. Kaepplinger had below average scores in certain areas of his neuropsychological testing, and that she

suffered from multiple psychological conditions and cognitive deficiencies. [293] 4-6; [274-1] 15; [274-2] 9. Dr. Sewick also offered his opinion, to a reasonable degree of neuropsychological certainty, that Plaintiffs current cognitive deficiencies were caused by her extended intensive care hospital stay in August 2015. [*Id.*]; *see also* [274-3] 20.

Defendants make two primary arguments as to why Dr. Sewick's testimony should be excluded or limited: (1) Dr. Sewick is not a medical doctor and therefore is not qualified to offer any opinions on whether Ms. Kaepplinger suffered a physical brain injury or cellular damage; and (2) in the absence of medical evidence of a brain injury, Dr. Sewick's opinion that Ms. Kaepplinger suffers from cognitive deficiencies as a result of her extended intensive care hospital stay should be excluded as speculative, lacking foundation, and beyond his experience as a non-medical expert. *See* [274] 2, 4-5, 7-8.

As to Defendants' first argument, Plaintiffs represent in their response brief that Dr. Sewick is "not diagnosing Angela Kaepplinger with cellular damage or organic brain damage or sepsis" and counsel for Plaintiffs confirmed at oral argument that Plaintiffs don't intend to have Dr. Sewick offer opinions diagnosing Ms. Kaepplinger with any physical injury. [293] 8. This portion of Defendants' motion at least would appear then to be unopposed, and the Court therefore grants Defendants' request to the extent that Dr. Sewick will not be permitted to offer medical opinions or a medical diagnosis that Ms. Kaepplinger suffered from a physical brain injury such as cellular or brain damage.

34

What remains is Defendants' argument that, in the absence of such medical testimony that Ms. Kaepplinger suffered a physical brain injury, Dr. Sewick has no basis for his ultimate causation opinion that Ms. Kaepplinger's cognitive deficiencies or low testing scores are causally related to her hospital stay. *See* [274] 6-7. Specifically, the Defendants claim that Dr. Sewick's ultimate causation opinion rests on the foundation that Ms. Kaepplinger suffered a physical injury and without that foundation he cannot offer his ultimate causation opinion. [*Id.*]; [302] 4. Defendants point to portions of Dr. Sewick's deposition testimony in which, while discussing the cause of Ms. Kaepplinger's cognitive deficiencies, Dr. Sewick referenced "cellular changes" that occur in the brain cells of individuals who experience similar medical conditions and extended hospitalization such as Ms. Kaepplinger did. [274] 3. Defendants note that there was no imaging of Ms. Kaepplinger's brain showing any cellular changes, and that Dr. Sewick himself admitted that Ms. Kaepplinger's treating physician made no findings of any brain injury or disfunction. [*Id.*] Thus, the Defendants argue that Dr. Sewick is "missing a crucial link in his causal chain," in attempting to offer the opinion that Ms. Kaepplinger's medical condition and extended hospital stay caused "cellular damage," which in turn caused her current cognitive defects, despite there being no foundation for the opinion that Ms. Kaepplinger suffered any cellular damage in her brain. [302] 4.

Apart from claiming his causation opinion lacks a proper foundation, Defendants also argue it is inadmissible due to its "speculative nature." [*Id.*] at 5. Dr. Sewick testified that, without a "compelling alternative explanation," it is his opinion

that Ms. Kaepplinger has a diffuse brain injury that is "consistent with" or "related to" her hospitalization in 2015. [274] 6; [274-3] 23; [293] 8. Defendants argue that this testimony amounts to a logical fallacy in which Dr. Sewick is improperly assuming the hospitalization must have caused Ms. Kaepplinger's low test scores simply because her low scores came after the hospitalization. [274] 6. Defendants argue that correlation does not equal causation, and that Dr. Sewick's testimony is too speculative to be admissible. [*Id*]

The Court finds that Defendants' argument that Dr. Sewick's testimony lacks foundation fails to account for the entire context and basis for his opinions. It does not appear to the Court that Dr. Sewick is resting his causation opinion entirely on the necessary existence of a physical brain injury that has not been medically diagnosed. Rather, Dr. Sewick's causation opinion appears to merely be that Ms. Kaepplinger's current alleged cognitive deficiencies are consistent with an individual who experienced an extended hospital stay and suffered from the medical conditions that Ms. Kaepplinger is documented to have experienced. For example, Dr. Sewick testified that his causation opinion is based on "[Ms. Kaepplinger's] medical records of sepsis, septic shock, respiratory distress, hypotension, acute respiratory distress syndrome, [and] metabolic acidosis." [273] 3. Dr. Sewick's expert report similarly concludes that "it is my impression that [Ms. Kaepplinger] presents with a Neurocognitive Disorder consistent with her 2015 history of septic shock, ARDS, hypotension, and metabolic acidosis." [274-1] 15.

Dr. Sewick's reference to potential "cellular changes" in the brain which are not specifically documented does not seem to the Court to be an attempt by Dr. Sewick to medically diagnose a physical injury as a basis for Ms. Kaeplinger's current condition. Instead, Dr. Sewick appears to have been offering his opinion as a neuropsychologist as to why, based on his knowledge and his experience, individuals who experience medical events like Ms. Kaepplinger can suffer from injuries causing cognitive deficiencies as a result of their hospitalization. This opinion seems well within Dr. Sewick's qualifications and experience to offer. Indeed, several courts have found neuropsychologists were qualified to render opinions on the cause and existence of brain injuries despite the lack of a medical degree. *See Allen v. Am. Cyanamid*, No. 11-CV-0055, 2021 WL 1086245, at *13 (E.D. Wis. Mar. 22, 2021) (finding proposed expert's "training, education, and experience as a neuropsychologist qualify her to offer expert testimony on the existence and etiology of plaintiffs' alleged brain injuries."); *Bado-Santana v. Ford Motor Co.*, 482 F. Supp. 2d 192, 195-96 (D.P.R. 2007) (holding a neuropsychologist was qualified to render testimony on brain injuries despite not being a physician or neurologist, noting that "the American Psychological Association has stated ... that neuropsychological testing is the only means of diagnosing some forms of brain damage.").

The Court does not believe Dr. Sewick's opinion lacks proper foundation, and holds that Dr. Sewick is qualified to offer his opinion—based on his knowledge, training, and experience as a neuropsychologist, his testing of Ms. Kaepplinger, and

his review of her medical records—that Ms. Kaepplinger suffers from cognitive deficiencies and that such deficiencies are consistent with her 2015 hospital stay.

Similarly, the Court also finds that Dr. Sewick's causation testimony is not impermissibly speculative, in that he is qualified by his knowledge and experience to offer his opinion, to a reasonable degree of neuropsychological certainty, that Ms. Kaepplinger's cognitive deficiencies are consistent with her hospital stay in 2015. Ultimately, Defendants are again asserting the same flawed argument they made with Mr. Gibson by conflating the issues of weight and admissibility. Defendants do not challenge Dr. Sewick's experience or qualifications as a neuropsychologist, nor his methods of testing, nor his qualification to offer neuropsychological opinions. To the extent that Defendants are arguing that Dr. Sewick's opinion rests on an improper assumption about the existence of a physical injury, or that he has not sufficiently considered alternate causes, these would be complaints about the "factual underpinnings" of his testimony that are more appropriately challenged on cross-examination than at the *Daubert* stage. *See* the discussion and cases cited *supra* at Section C.2. As it is, the Court cannot say that Dr. Sewick's testimony is so speculative or unreliable to warrant exclusion under *Daubert*. It will be for the jury to weigh Dr. Sewick's testimony and analyze the soundness of the underlying facts and assumptions he relied upon, and determine whether those underlying facts and assumptions support his conclusions.

The Court therefore grants Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24 to the extent that it seeks to bar Dr. Sewick from offering medical

opinions or diagnoses that Ms. Kaepplinger suffered from a physical brain injury, but denies the motion in all other respects as to Dr. Sewick's remaining causation opinion testimony.

## Conclusion

For all the foregoing reasons, Plaintiffs' Motion *in Limine* No. 20 is granted; Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 16 is granted; Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 23 is denied; and Defendants Dr. Zarnke and SANI's Motion *in Limine* No. 24 is granted in part and denied in part.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 28, 2022**